## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCHES OF** | ) | |
| | ) | |
| **2300 Good Hope Road, SE** | ) | **MAG. NO.:** |
| **Apartment 710** | ) | |
| **Washington, D.C.** | ) | **UNDER SEAL** |
| | ) | |
| **Black 2008 Cadillac Escalade** | ) | |
| **District of Columbia license EX 3673** | ) | |
| **VIN 1GYFK63888R183867** | ) | |

### AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

Your affiant, Special Agent Timothy J. Ervin of the Federal Bureau of Investigation (FBI),

Washington, D.C., having been duly sworn, states the following:

### I.      INTRODUCTION

1.      I  am "an investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated

in Section 2516 of Title 18, United States Code.   I have been a Special Agent with the FBI since

1991, where I am currently assigned to squad CR-3 at the Washington Field Office (WFO).

Squad CR-3 is responsible for conducting investigations which target Drug Trafficking

Organizations.   During the periods 1996 to 2002 and 2003 to the present date, I have been

working on federal narcotics investigations and have participated in numerous investigations

which led to the arrest and conviction of narcotics distributors.   Since 1991, I have received

training and experience in interviewing and interrogation techniques, arrest procedures, search and

seizure, narcotics, white collar crimes, search warrant applications, and various other crimes.   In

the course of my training and experience, I have become familiar with the methods and techniques

associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and court authorized recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

2.     Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, your affiant knows that:

(a)     Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Also, these items are generally maintained in the trafficker's residence, or residences of associates, friends or relatives, in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses, or in business locations with which the trafficker is associated and where the trafficker has ready access to these items. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

(b)      Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions;

(c)      It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, strainers, microwave ovens, pots, dishes and other containers for preparing cocaine and other controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses;

(d)      Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization.   These individuals often utilize telephones, cellular telephones and hand held electronic devices to maintain contact with other associates of their illegal businesses, and these telephone records, bills and numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses;

(e)      Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband.   These photographs are usually maintained in their places of

3

residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses;

(f)     Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities.   These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses; and

(g)     Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection.   Deposits to bank accounts create an accessible record (or paper trail) of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service (IRS).   Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting.

(h)     Drug traffickers often use coded language and terms to disguise conversations about their drug activities.   Drug traffickers also frequently use hand held electronic devices

(i)     Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes.   Traffickers often keep computers and computer related equipment in their home and utilize the equipment to keep detailed records of their narcotics transactions.   Various computer software programs originally designed for

4

balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking.   In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

3.     This affidavit is based, in part, upon information provided to me by other Special Agents of the FBI, and officers from the Washington, D.C., Metropolitan Police Department (MPD), review of numerous text messages, arrest records, hotel records, physical surveillance, interviews of witnesses, court authorized tracking of a cellular telephone and a vehicle, and other information gathered during the course of this investigation.   Since this affidavit is being submitted for the limited purpose of securing authorization for the search of one residence and one vehicle, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts I believe are necessary to establish probable cause for the issuance of the search warrants requested herein.

4.     As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI, and officers of the MPD, I am familiar with all aspects of this investigation.   On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show there is probable cause to believe that the fruits, evidence, and instrumentalities of violations of the following federal offenses, among others, are presently to be found in the

residence and vehicle described in Section II, and further listed in Section V, subsection B, of this affidavit:

(i)     Possession with intent to distribute and Distribution of controlled substances, in violations of Title 21, United States Code § 841(a)(1);

(ii)    Use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code

§ 843(b); and

(iii)   Conspiracy to commit such offenses, in violation of Title 21 United States Code § 846 and Title 18, United States Code § 371.

## II.   <u>PROPERTY TO BE SEIZED</u>

As described above, and where probable cause is shown that the fruits, evidence, and instrumentalities in violation of such crimes exist, your Affiant seeks to search and seize, as described further in Attachment B, the following:

1.      Drugs and drug paraphernalia.

2.      Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine, prescription drugs, or other controlled substances.

3.      Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

4.      Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

5.      United States currency, precious metals, jewelry and financial instruments, stocks and bonds.

6.      Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

7.      Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

8.      Cellular telephones, hand held electronic devices and records and receipts reflecting their ownership and use.

9.      Safes, both combination and key type, and their contents.

10.     Indicia of occupancy, residence and/or ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes and keys.

11.     Any and all electronic data processing and storage devices, computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

III.     **PROBABLE CAUSE**

     (A)     **Previous Arrest of BROOKS**

    5.     On April 1, 2014, MPD 2nd District officers approached SEKOU BROOKS as he was sitting in a vehicle with a female named JAMILAH LEEPER.   The vehicle had been idling for an excessive period of time in an area where several recent burglaries had occurred.   Officers observed orange pills in the cup holder, and asked BROOKS to exit the vehicle.   BROOKS then repeatedly slammed the vehicle door on an officer's leg, while LEEPER said "I got the stuff," then ran from the scene.   BROOKS and LEEPER were both arrested.   In the vehicle, officers seized 34 oxycodone pills and three bags of a green weed substance field tested positive for THC. BROOKS had $764 in his pants pocket. Seized from LEEPER's purse were $3,352, as well as 28 pink Adderall amphetamine pills, 48 oxycodone pills, 13 orange Adderall amphetamine pills, 61 clonazepam pills, approximately 3.8 grams of a substance field tested positive for cocaine and approximately 20 grams of a substance that field tested positive for cocaine base. (The resulting Superior Court cases against BROOKS and LEEPER, 2014 CF2 5661 and 5663, were dismissed without prejudice because an essential MPD officer witness was out of the country on the scheduled trial date and was unavailable for trial.)

     (B)     **The Investigation**

    6.     SEKOU BROOKS, also known as "KING," is believed to be a distributor of both narcotic and illicitly distributed prescription drugs.   He has supplied several students at George Washington University (GWU) in Washington, D.C., to include Witness 1 (W1), Witness 2 (W2), Witness 3 (W3), and Witness 4 (W4).   For the sake of brevity, all four witnesses will be referred to herein by the masculine gender.

8

7.      On the morning of September 19, 2014, a fifth GWU student, Victim 1, died in the apartment of W4. The D.C. Chief Medical Examiner determined the cause of death to be the combined toxic effect of cocaine, oxycodone and alcohol.   W4 was interviewed by MPD on the morning of Victim 1's death, and said he and Victim 1 took Percocet together on the night of September 18th, and had been using painkilling drugs together for the last couple weeks.   He also said Victim 1 had ingested cocaine at a party on the night of September 18th.

8.      Investigators located Victim 1's cellular telephone, and subsequently Victim 1's family provided the FBI with written consent for search of the phone.   The phone contained many chats and text messages which were written during the period September 21, 2012 to September 19, 2014.   In the chats and texts there were very frequent and specific discussions about obtaining and using controlled substances.   A few of those discussions are summarized below:

9.      On February 19, 2014, Victim 1 asked W1 "what drugs do you have." W1 responded "perk, bars, bananas…and weed…and aderol."   Victim 1 asked "where did you get this."   W1 responded "from my drug dealer."   Victim 1 asked "you mean [W4]." W1 responded "No king." Based on training and experience and investigation in this matter, your affiant believes "perk, bars, bananas and weed" to be slang terms for Percocet, xanax, extended release xanax, and marijuana.   As further discussed below, the affiant believes "king" is a reference to BROOKS.

10.      On May 3, 2014, W2 wrote "king got those perk 60s if u tryna split." Victim 1 said "you shouldn't be buying perks from drug dealers."   Your affiant believes "king" refers to BROOKS, and "perk 60s" is slang for 60mg Percocet pills.

11.      On September 6, 2014, W2 wrote "as I go to kings [W3] walks out into his car and then I go up go kings and [W3] wrote him a check…[W3's] check was on the bed next to the

blow…he probably got 10 blues and like 20 muscle relaxers." W2 also wrote that this event took place at the Georgetown Inn in Washington, D.C. Victim 1 later asked "what did you cop." W2 said "I got ur blue." In this text exchange, your affiant believes that as W2 went to the hotel room of "king" (meaning BROOKS), W2 observed W3 walk out. When W2 got inside BROOKS' hotel room, he saw a check written from W3 to BROOKS on the bed. W2 said the check was "next to the blow" (a slang term for cocaine). Your affiant is aware that "blue" or "blues" are slang terms which refer to the prescription drug Roxicodone. W2 speculated W3 wrote the check to BROOKS as payment for 10 Roxicodone pills and 20 muscle relaxers. Records obtained pursuant to an administrative subpoena confirmed SEKOU BROOKS was checked into the Georgetown Inn on September 6, 2014.

12.     W3's bank records from Signature Bank were obtained pursuant to a Grand Jury subpoena. Review of those records determined W3 wrote 35 checks to SEKOU BROOKS during the period September 6, 2014 to February 5, 2015. The total amount of those checks was $21,917. The amount of the check written on September 6, 2015 was $300.

13.     Investigation by the FBI also determined BROOKS uses an online payment service called VENMO. His VENMO account name is "KINGKOOL." Records of BROOKS' VENMO transactions were also obtained pursuant to a Grand Jury subpoena. Review of those records determined W3 made numerous VENMO payments to BROOKS during the period September 1, 2014 to February 3, 2015. The total amount of the VENMO payments made by W3 to BROOKS during that period were $22,830.

14.     On September 18, 2014, Victim 1 asked W2 "if king has blues." W2 responded "Idk he didn't answer me today." Your affiant notes Victim 1 wrote this text on the day before his

death.   It appears Victim 1 was hoping W2 could obtain blues (Roxicodone) from BROOKS.

15.     On May 21, 2015, W2 provided the FBI with an exchange of text messages he had with BROOKS on February 5, 2015.   For those texts, BROOKS was using telephone number 202-427-4964. BROOKS sent a text saying "Quincy Hotel."   W2 wrote back "any snow?"   BROOKS said "yep."   W2 asked "what's the $ for a G."   KING wrote "100," then "#902."   In this exchange, your affiant believes W2 was arranging to purchase a "G" (meaning a gram) of "snow" (cocaine) from BROOKS for $100 in room 902 of the Quincy hotel in Washington, D.C.

16.     The FBI served an administrative subpoena on the Quincy Hotel, and they confirmed SEKOU BROOKS rented room 902 on the night of February 5, 2015.   It was also determined BROOKS has stayed in the Quincy Hotel on numerous other nights.   During a stay on March 7, 2015, an employee of the hotel wrote an e-mail to other employees which indicated 28 young men and a few couples came into the hotel and went to the floor of BROOKS' room.   They stayed for just a few minutes, then left.   Your affiant believes that hotel employee's observation is consistent with the belief that BROOKS sells narcotics out of hotel rooms in Washington, D.C.

17.     On June 4, 2015, W2 provided the FBI written consent for a search of his cellular telephone.   Located on that phone was an exchange of text messages W2 had with another GWU student on February 7, 2015.   That student asked W2 "King?"   W2 responded "U want his number."   The student asked "is he sketchy."   W2 then said "not that bad…pretty safe. u go up to a hotel room."   W2 later sent the student "KING's" phone number as "(202) 427-4964."

**(C)    Witness Information**

18.     W1, W2, W3, and W4 have informed law enforcement that they purchased narcotics from "KING."   W2, W3, and W4 each identified SEKOU BROOKS as KING in a photo

array.   W2, W3, and W4 have each been confronted by the FBI and have admitted distributing drugs to others.   Summaries of the statements each of the four witnesses made to the FBI about BROOKS are detailed below.

19.   W1 purchased cocaine, xanax and Percocet from BROOKS on multiple occasions. The transactions took place in hotel rooms in Washington, D.C.   BROOKS also had oxycodone and other drugs available for sale.

20.   W2 indicated BROOKS sold cocaine and numerous types of prescription pills from different hotel rooms he would rent near GWU.   W2 has purchased cocaine and roxicodone from BROOKS.   When W2 was in BROOKS' hotel rooms to complete transactions, he saw several sandwich bags filled with different types of pills.

21.   W3 admitted all the funds he paid to BROOKS ($21,917 in personal checks, and $22,830 in VENMO payments) were for the purchase of narcotics and prescription pills.   W3 also made numerous purchases from BROOKS with cash.   BROOKS distributes xanax, klonopin, roxicodone, opanna, and cocaine.   W3 would sometimes purchase as much as 50 roxicodone pills from BROOKS at a time.   The transactions usually took place in whatever hotel room BROOKS' was currently renting in Washington, D.C.   W3 also sometimes got into BROOKS' vehicle to make a purchase. In February of 2015, W3 overdosed on roxicodone and ketamine, and nearly died.   He had purchased the roxicodone from BROOKS.

22.   W4 advised that BROOKS is a large-scale distributor of narcotics and prescription drugs in Washington, D.C.   W4 would meet BROOKS in hotel rooms to purchase roxicodone and xanax.   BROOKS also sold cocaine and marijuana.   When W4 got into BROOKS' hotel room, he would see the drugs in plastic bags on the bed.   BROOKS often had as many as 200 – 300

roxicodone pills available for sale. While W4 was at the hotel, he would see numerous other young

men also there to buy drugs from BROOKS.

   **(D)**   **Cell Site & Vehicle Tracking**

23.   Court authorized tracking of BROOKS' cellular telephone (202-427-4964) was

initiated on August 3, 2015, and expired at the end of the 30 day period on September 1, 2015.

Court authorized tracking of BROOKS' vehicle, a 2008 Cadillac Escalade with DC license EX

3673, was initiated on August 28, 2015, and continues as of this date. Based on cell site tracking,

vehicle tracking, physical surveillance, hotel records obtained via administrative subpoenas and

interviews of hotel management, it appears BROOKS has stayed in hotel rooms on the great

majority of the nights since August 3rd.   During that period, he spent one night in downtown

Baltimore, and one near the Maryland Live Casino.   It also appears he slept in his residence, 2300

Good Hope Road, apartment 710, on three occasions.   On all the other evenings since August 3rd,

it appears BROOKS stayed in a hotel in the northwest quadrant of Washington, D.C.   BROOKS

moves from one hotel to another, sometimes staying one night in each, other times staying for

several nights before moving on.

24.   Administrative subpoenas were issued to twelve hotels in northwest, Washington,

D.C.   Between those twelve hotels, BROOKS was a guest on at least 188 nights during the period

August of 2014 to the present date.   A manager at the Hilton Garden Inn, where BROOKS has

spent 46 nights since April of 2014, told the FBI he believes BROOKS is a "drug dealer."   Each

time BROOKS stays there, a heavy volume of people (mostly young men) arrive at the hotel to see

BROOKS, and they only usually stay in his company for about five minutes.   A manager at the

Churchill Hotel, where BROOKS has spent 10 nights since August of 2014, also said he believes

BROOKS is a "drug dealer."   That belief is based on the large amounts of currency displayed by

BROOKS, as well as the heavy volume of people going to his room at the hotel.   Most recently,

the investigation determined BROOKS stayed at the Residence Inn at 801 New Hampshire

Avenue, N.W., Washington, D.C., on the nights of September 4, 5, 6 and 7, 2015.   Your affiant

notes that this hotel stay coincides with the recent start of the George Washington University

("GWU") Fall semester, and the very close proximity of that hotel to the GWU campus.   This is

consistent with the statements of W1, W2, W3 and W4 that they purchased drugs from BROOKS

in hotel rooms in D.C. while they were college students.

      (E)    **Controlled Buy**

     25.    Confidential Informant 1 ("CI-1") is not in a position to testify in this

investigation.   CI-1 initially began assisting the United States pursuant to a plea agreement in a

white collar crime case in early 2013, and is cooperating with the Government in hopes of earning

a reduction in sentence pursuant to 18 U.S.C.§ 3553(e) and U.S.S.G. § 5K.   CI-1 has provided a

substantial amount of information which has been corroborated by other investigation.   However,

during the early portion of CI-1's cooperation in the white collar crime case, in which CI-1, on a

consensual wire, was permitted to block out private numbers, CI-1 attempted to conceal the nature

of CI-1's relationship with a known narcotics distributor by blocking out that distributor's

telephone number.   The government eventually confronted CI-1 about calls to and from the

distributor, at which time CI-1 acknowledged knowing the distributor for numerous years, and

being supplied with cocaine by the distributor for numerous years prior to the period of

cooperation.   Since the time that CI-1 has admitted to that relationship, its information has

appeared reliable.   Further, CI-1's observations in this investigation and others have been

confirmed through numerous other investigative methods.   In sum, CI-1 hid its relationship with

the distributor because the relationship involved illicit narcotics, but since confronted with its

contacts with the distributor, CI-1 has always appeared credible, and your affiant is unaware of another instance in which CI-1 has misled law enforcement since taking responsibility for the full breadth of its relationship with the distributor.

26.     Sometime during the week of September 7-11, 2015, (exact date omitted to protect CI identity), CI-1 exchanged text messages with the cell phone number used by SEKOU BROOKS, 202-427-4964.   Those text messages set up a meeting at a certain hotel room in, Washington, D.C.   The affiant viewed the text messages on CI-1's phone and confirmed they were to/from BROOKS' phone.   After being searched by FBI agents, CI-1 was provided with a transmitter and FBI funds.   CI-1 was then followed as it entered the hotel.   CI-1 later was observed exiting the hotel and returning to a staging area.   At the staging area, CI-1 was again searched, and turned over a small quantity of a substance which appeared to be cocaine.   The FBI later field tested the substance as being positive for the presence of cocaine.   CI-1 indicated it had purchased the substance from BROOKS inside of the hotel room.

## IV.   FACTS AND CIRCUMSTANCES WHICH ESTABLISH PROBABLE CAUSE TO SEARCH THE LISTED LOCATION AND VEHICLE

27.     The following paragraphs continue to summarize the results of this investigation and combined with the information above, set forth sufficient probable cause to support authorization of a search warrant for the residence and vehicle particularly described in Section V of this affidavit.   For reasons detailed in Section I, it is likely that the items detailed in Section II related to narcotics trafficking activity by BROOKS are present in the residence and vehicle detailed below.

**2300 Good Hope Road, SE, apartment 710, Washington, DC**

28.     This is the residence of SEKOU BROOKS and his wife, Tiffany Brooks. This is the address BROOKS gave to MPD officers when he was arrested in April of 2014.   Based on that arrest, the Pretrial Services Agency verified this address as BROOKS' residence for the preceding three years.   SEKOU BROOKS' Facebook page has numerous photos of himself with Tiffany Brooks. Investigation determined a 2010 Chevy Equinox with DC license EW 8771 is registered to Tiffany Brooks at 2300 Good Hope Road, S.E., apartment 710, Washington, D.C.   That vehicle was observed parked in the underground garage at 2300 Good Hope Road on the morning of September 9, 2015.

29.     Review of records from court authorized tracking of BROOKS' vehicle and cellular telephone determined the vehicle and/or telephone were located in the close vicinity of 2300 Good Hope Road on numerous occasions since August 3, 2015.   BROOKS' 2008 Cadillac Escalade was observed parked in the underground garage at 2300 Good Hope Road during the early morning hours of August 31, 2015.   Based on tracking locations from the vehicle as precise as 40 meters, it is believed BROOKS has spent the night at 2300 Good Hope Road three times since August 30th.   Tracking locations for the vehicle at 2300 Good Hope Road were most recently received on the morning of September 9, 2015.   It is believed that BROOKS uses this residence to store narcotics and narcotics proceeds.

**Black 2008 Cadillac Escalade District of Columbia license EX 3673**
**VIN 1GYFK63888R183867**

30.     This vehicle is registered to SEKOU BROOKS.   FBI surveillance has observed BROOKS driving this vehicle on several occasions. Analysis of vehicle tracking records and hotel records have demonstrated that BROOKS uses this vehicle to travel from his residence to the hotels he uses in Northwest, Washington, D.C., to distribute narcotics to his customers.   It is believed that BROOKS transports narcotics and narcotics proceeds in this vehicle.


## V.      DESCRIPTIONS OF LOCATIONS TO BE SEARCHED

31.     This affidavit is respectfully submitted in support of an application for the issuance of search warrants for BROOKS' residence and vehicle. Authority to search the following locations is sought herein:

**2300 Good Hope Road, SE, apartment 710, Washington, DC**

The property commonly known as 2300 Good Hope Road, SE, Washington, D.C., further described in Attachment A1, is an 11 story apartment building in the Marbury Plaza Apartments complex.

**Black 2008 Cadillac Escalade District of Columbia license EX 3673**
**VIN 1GYFK63888R183867**

The vehicle is described as a 2008 Cadillac Escalade with District of Columbia License Plate EX 3673 and Vehicle Identification Number 1GYFK63888R183867.   This vehicle is black in color and registered to SEKOU BROOKS as further described in Attachment A2.

17

## VI.     **CONCLUSION**

32.     Based on the foregoing information, I submit there is probable cause to believe SEKOU BROOKS is involved in a conspiracy to distribute and possess with intent to distribute cocaine and pharmaceutical drugs, and within the aforementioned residence and vehicle are evidence and instrumentalities of the crime of conspiracy to distribute and possess with intent to distribute, and distribution and possession with intent to distribute, illegal narcotics, as more particularly set forth in Section II of the application for the issuance of the search warrants.


_____
Timothy J. Ervin
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me this _____ day of September 2015


_____
G. Michael Harvey
United States Magistrate Judge
  for the District of Columbia